# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| MARCINA KILGORE, | : | Case No. 3:18-cv-61 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ENTRY

## I.     Introduction

Plaintiff Marcina Kilgore brings this case challenging the Social Security Administration's denial of her application for period of disability and Disability Insurance Benefits. She applied for benefits on May 1, 2013, asserting that she could no longer work a substantial paid job. After a hearing, Administrative Law Judge (ALJ) Gregory G. Kenyon concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

Plaintiff appealed. The Appeals Council vacated ALJ Kenyon's decision and remanded the case to resolve several issues. Upon remand, ALJ Kenyon conducted a second hearing after which he found that Plaintiff was not under a disability and was therefore, not eligible for benefits.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #12), the Commissioner's Memorandum in Opposition (Doc. #16), Plaintiff's Reply (Doc. #17), and the administrative record (Doc. #5).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

## II.  **Background**

Plaintiff asserts that she has been under a "disability" since March 1, 2010. She was forty years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(c).[1] She has a high school education. *See id*. § 404.1564(b)(4).

### A.  **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Kenyon that she has fibromyalgia and a lot of pain, starting in the back of her neck, down her shoulders, along her spine, and across her hips. (Doc. #5, *PageID* #93). She also has pain in other places, but not consistently. For instance, she has arm pain four to five days a week. *Id.* at 108-109.

Her pain can be burning, throbbing, or stabbing. *Id.* at 93. It sometimes feels like she is bruised or like she has worked out. On a scale from one to ten, her pain—without medication and little-to-no activity—is eight. *Id.* With medication and little-to-no activity, her pain is about six. *Id.* at 93-94. If she does a lot of activity, her pain is over

---

[1] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

ten.  *Id.* at 94.  It does not take much activity for her pain to flare up.  For her grandson's

birthday, she showered, wiped her kitchen counters and table, and hung a few

decorations.  *Id.* at 95.  After those limited activities, the back of her neck hurt and her

arms and heels of her feet burned.  *Id.*

If Plaintiff uses her hands, they hurt.  *Id.* at 109.  Sometimes she struggles with

grabbing or holding onto things.  *Id.* at 110.  She has dropped "quite a few" dishes and

has trouble opening things with her hands.  *Id.*  She has to use a "little rubber thing" to

open a gallon of milk.  *Id.*  Additionally, "I can have pain in my upper arms if I tried to

do … dishes or laundry in and out of the washer.  It'll feel super fatigued and painful."

*Id.* at 94.  She sometimes feels like there is a tight knot near her shoulder blade that

causes her difficulty reaching above her head.  *Id.* at 97.  Further, temperature extremes

aggravate her pain.  *Id.*  Sometimes her pain flares up "out of the blue."  *Id.* at 95.

Plaintiff takes pain medication—pentazocine.  *Id.*  Unfortunately, "[i]t is

beginning to wear off its ability to help."  *Id.* at 98.  Her doctor wants her to try a patch

that delivers consistent pain relief but her insurance will not approve it.  *Id.*  Plaintiff had

some cervical epidurals that helped with pain from her disc problems but not with her

other pain.  *Id.* at 99.  She also had occipital nerve blocks to help with her headaches.  *Id.*

They provided some relief but were extremely painful.  *Id.*

Plaintiff also tried physical therapy (a couple years before the hearing).  *Id.* at 98.

It helped with her muscle pain but seemed to trigger migraines.  *Id.* at 98-99.  Ultimately,

she discontinued it because she has a $30 copay and could not afford to go to physical

therapy two to three times a week in additional to all the specialists she sees and medication costs. *Id*.

Plaintiff also gets migraines. She usually knows when a migraine is starting—she has blurred vision, noises are amplified, and it feels like things are spinning. *Id*. at 100. When it starts, she takes medication, uses ice packs, drinks water, tries to eat something, and sits in a recliner with the blinds shut. *Id*. at 113. She has "full-blown" migraines four to five days a week. *Id*. at 100. They sometimes last two to three days. *Id*. at 112. Her doctor has given her Toradol shots to stop them. *Id*. at 112-13. On a scale from one to ten, her pain during a migraine can be over ten: "It can be excruciating. It can where I'm in tears, which I know isn't going to help the migraine, but it hurts. I feel horribly nauseated. Any level of sound -- all my children know to be quiet. Ice, darkened room …." *Id*. at 101. She takes Imitrex to help with the pain. *Id*. at 112. She has to choose carefully when she takes it because she can only take nine pills per month. *Id*. At the time of the hearing, she had just finished her third set of Botox treatments. *Id*. at 100. They provide her with up to 40% relief. Unfortunately, relief only lasts three weeks and she can only get them every ninety days. *Id*.

Plaintiff also experiences fatigue—she wakes up tired and never feels rested. *Id*. at 95. In addition, she has trouble concentrating. *Id*. at 96. "I do have difficulty being able to recall things or express my words, and I lose track of words, can't find the right word." *Id*. She made an outline for the hearing in case she cannot remember a word.

Plaintiff has obstructive sleep apnea. *Id*. at 102. She does not use a CPAP machine. She used to only sleep for around three hours at a time. However, she started

taking trazadone and because it knocks her out, she generally sleeps five to six hours a night. *Id*.

Plaintiff experienced excruciating chest pains in the months before the hearing. *Id.* at 119. She was taken to the hospital by ambulance, and the only cause they could find for the pain was extremely high blood pressure. *Id*. She now sees a cardiologist and is on medication to control her blood pressure. *Id*. However, she continued to have chest pains and Dr. Gebhart diagnosed allodynia—"inflammation that goes hand-in-hand with fibro." *Id.* at 119-20.

She was also recently diagnosed with gastroesophageal reflux disease. *Id.* at 120. She sometimes wakes up in the middle of the night gasping for air and vomiting acid through her nose. *Id*. She vomits at least once a week. *Id*.

Plaintiff struggles with depression and anxiety. She explained, "I was quite the perfectionist, very organized, very goal-oriented. And to not be in control of the way my body feels is very depressing." *Id.* at 103. She has crying spells a couple times every week. *Id.* at 104, 114. However, she tries to keep her depression from her family. *Id.* at 105. She has thoughts of killing herself a couple times a month. *Id.* at 104-05. She saw a psychiatrist but stopped because she could not afford the co-pay in addition to all her other doctors' co-pays. *Id.* at 103. She has had trouble with interpersonal relationships. *Id.* at 114. She does not have any friends anymore. *Id.* at 115.

Plaintiff could not say how many pounds she could lift but said that she needs two hands to take a gallon of milk out of the refrigerator. *Id.* at 105. She can sometimes stand for fifteen to twenty minutes and can maybe push it to thirty minutes. *Id*. She can

walk between one and five blocks. *Id*. After sitting for an hour, she starts to get stiff and sore. *Id.* at 106. She is able to take care of her personal needs but it takes a lot of energy. *Id*. She only showers if she knows she has to leave the house. *Id*. She only leaves the house when she has doctor appointments and sometimes to go grocery shopping with her husband. *Id.* at 111. She estimated that she stays home twenty to twenty-five days a month. *Id*. She does some light housework—for instance, cleaning kitchen counters, some laundry, and making the bed. *Id.* at 106. Although she is able to, Plaintiff does not drive very often because, for example, her vision is sometimes blurred; she gets migraines; and she gets lost and has trouble remembering where she is. *Id.* at 92.

During an ordinary day, she wakes up, has coffee and something to eat so she can take medication. *Id.* at 107. While waiting for the medication to kick in, she sits with ice packs or a heating pad. She takes care of two small dogs—letting them outside and feeding them. If she has to shower, that takes her a few hours. She does not cook very much anymore because of the time and energy involved. *Id*. She lies down every day for an hour or hour and a half. *Id.* at 116. It helps with her fatigue but she always wakes up with pain. *Id*. If she doesn't lay down, she starts to feel disoriented, she cannot focus, and she feels like she is in a haze. *Id.* at 117. She has trouble communicating with her children and sometimes forgets what she told them. *Id.* at 118.

### B.    Medical Opinions

#### i.    *Rick Gebhart, M.D.*

Plaintiff's treating physician, Dr. Gebhart, is board certified in family medicine and bariatric medicine. *Id.* at 1106. He has his own practice in Vandalia and has been in

private practice for nineteen years.  *Id*.  Dr. Gebhart has between 150 and 200 patients with fibromyalgia—more than any other doctor in his town.  *Id*. at 1130.  Plaintiff has been his patient for at least ten years.  *Id*. at 1108.  He sees her about every eight weeks. *Id*. at 1109.

On August 25, 2014, Dr. Gebhart gave a statement to Plaintiff's counsel.  *Id*. at 1102-36.  He testified that he was treating her for fibromyalgia,[2] a history of migraines, and depression—which he speculates is "the bipolar type."  *Id*. at 1108.  Plaintiff also has a history of tinnitus:  "it drives her sometimes almost crazy.  I think it drives the anxiety and the anxiety drives it and it becomes a vicious cycle."  *Id*. at 1109.  Further, Plaintiff recently reported to Dr. Gebhart that her rheumatologist diagnosed psoriatic arthritis.  *Id*.

Before her health began declining, Plaintiff saw Dr. Gebhart for "normal things people come to the doctors for."  *Id*. at 1111.  He described her as a "very vibrant, hard working person …."  *Id*.  Now, however, she is "[v]ery frustrated because we've got these [] diagnoses we can't seem to fix and we try to treat the symptoms …."  *Id*.  Dr. Gebhart has "no doubt at all" about the credibility and veracity of Plaintiff's complaints. *Id*. at 1125.

Plaintiff's fibromyalgia, depression, and tinnitus "started abruptly about two and half, three years ago."  *Id*. at 1110.  Dr. Gebhart explained that migraine headaches, fibromyalgia, anxiety, depression, and irritable bowel syndrome "sit on the same gene." *Id*. at 1115-16.  When that gene fractures, the more it fractures, the more of these

---

[2] Dr. Gebhart noted that in some of Plaintiff's treatment records, the term "myositis" or "myalgia" is sometimes used in place of "fibromyalgia."  (Doc. #5, *PageID* #s 1112, 1117).

diagnoses, so I start with migraines and later on as the gene fractures, you get fibromyalgia. *Id.* at 1116. Genes fracturing is "[g]enerally caused through some sort of, what is thought is the new genetic sort of trauma." *Id.* It can be physical trauma (i.e., car accident, blow to the head), emotional trauma, or infectious trauma. *Id.*

Dr. Gebhart provided significant background information about fibromyalgia. He explained, fibromyalgia is caused by "excessive amounts of glutamate and excessive amounts of substance P in the cerebral spinal fluid." *Id.* at 1114. Generally, fibromyalgia "generates hyperesthesia, pain that is out of proportion to what a normal person would feel." *Id.* It also usually causes people to have "an extreme amount of fatigue." *Id.* at 1115. People with fibromyalgia do not sleep in stage four and REM sleep as often as others. *Id.* As a result, even when they do sleep, it is not as restorative. *Id.*

There is no method to objectively determine the presence of fibromyalgia. *Id.* at 1116. Under the American College of Rheumatology's 2009 (and before) standards, to diagnose fibromyalgia, a person was required to have eleven of eighteen tenderpoints. *Id.* at 1113-14. This standard changed in 2010, and under the new standards, to diagnose fibromyalgia, an individual must have fatigue for at least six months and have muscle aches and pain for at least six months, and the physician must rule out any other medical diseases that could cause the symptoms. *Id.* at 1113.

Based on these standards, Dr. Gebhart diagnosed Plaintiff with fibromyalgia. *Id.* He rated her condition as chronic—lasting more than six months with no end in the near future. *Id.* at 1124. When asked if fibromyalgia is a progressive disease, he explained, "I think it's different for each person, but as I always tell my patients that environment

magnifies disease and if you have a fibromyalgia patient and they are in your, maybe they have a poor family structure that doesn't support them, they are trying to still work at a job and there's a lot of stress at that workplace, that it definitely worsens the disease." *Id.* at 1124-25. He is not hopeful about Plaintiff's chances for improvement. *Id.* at 1125.

Plaintiff takes several medications for treatment of fibromyalgia. Dr. Gebhart did not have a list of Plaintiff's medications, but indicated that he aims to "get these pain signals coming from the spinal cord to quiet down." *Id.* at 1115. After reviewing a list of Plaintiff's medications, Dr. Gebhart indicated that three of them—Gabapentin, Lyrica, and Pentazine—all have side effects involving feeling drunk and/or disoriented. *Id.* at 1132. Another of her medications, Topiramate, is known to cause short-term memory loss. *Id.* at 1132-33.

Some doctors believe that if a patient with fibromyalgia gets up and moving, it will help the patient's symptoms. *Id.* at 1122. Dr. Gebhart tells patients with fibromyalgia to "ignore the advice of other people." *Id.* Instead, he instructs them to "take it easy." *Id.* at 1123.

Dr. Gebhart also treats Plaintiff's depression with medication. However, it has been resistant to Serotonin. *Id.* at 1117. This leads Dr. Gebhart to conclude that her depression is the bipolar type—caused by an excess of D2 Dopamine. *Id.*

Plaintiff has trigeminal neuralgia and occipital neuritis. Dr. Gebhart testified that trigeminal neuralgia occurs "when [the] trigeminal nerve gets impinged when it's coming out of the skull." *Id.* at 1118. Occipital neuritis occurs when "the occipital nerve … gets extremely hot. Not known why this happens or occurs …." *Id.* Occipital neuritis also

triggers migraines. Dr. Gebhart has used nerve blocks—steroid injections—several times to provide temporary relief. *Id.* at 1119. Unfortunately, it will never be a permanent fix for Plaintiff. *Id.* The next step would be to have Plaintiff's occipital nerves clipped by a neurosurgeon. *Id.* at 1121. But, surgery may or may not help Plaintiff's migraines and tinnitus. *Id.* It would not impact her fibromyalgia. *Id.*

Dr. Gebhart opined that Plaintiff has moderate-to-severe pain most of the time. *Id.* at 1127. Her pain constantly interferes with her attention and concentration. *Id.* Her prognosis is "very poor." *Id.* Dr. Gebhart opined that she could sit in a work environment for less than two hours, stand and/or walk for less than two hours, and could not make it through an eight-hour work day without lying down. *Id.* at 1128. She could rarely carry 11 to 20 pounds and occasionally carry 10 or less pounds. *Id.* at 1128-29. Plaintiff has pain in her hands (a complaint that is common from people with fibromyalgia). *Id.* at 1129. At maximum, she could occasionally use her hands to finger, handle, or grip things. *Id.*

If Plaintiff attempted to work, she would "be lucky to make one out of every three days from work. Maybe once or twice a week and she'd miss the other days." *Id.* at 1131. Dr. Gebhart opined that between March of 2010 and the time of his statement, Plaintiff was unable to physically perform duties of any job. *Id.* at 1134. He likewise does not foresee her being able to return to work within the next five to seven years. *Id.*

On October 10, 2016, Dr. Gebhart completed a second opinion. *Id.* at 1384-85. He affirmed his prior opinions, and opined that Plaintiff's condition had worsened. *Id.* at

1384.  He opined that she would miss between ten and twelve days of work per month because of her conditions, symptoms, and treatment.  *Id.*

### ii. *Paul Tangeman, Ph.D., & Todd Finnerty, Psy.D.*

Dr. Tangeman reviewed Plaintiff's records on July 31, 2013.  *Id.* at 176-87.  He found that Plaintiff has three severe impairments—disorder of the back–discogenic and degenerative; affective disorder; and anxiety disorder.  *Id.* at 183.  However, there was insufficient medical evidence to establish functional limitations.  *Id.* at 184.

On September 26, 2013, Dr. Finnerty reviewed Plaintiff's records and agreed with Dr. Tangeman's assessment.  *Id.* at 190-99.

### iii. *Malika Haque, M.D., & Diane Manos, M.D.*

On July 29, 2013, Dr. Haque reviewed Plaintiff's records.  *Id.* at 176-87.  She found that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently.  *Id.* at 185.  She could stand and/or walk for six hours in an eight-hour workday and sit for six hours.  *Id.*  Dr. Haque concluded that Plaintiff is not under a disability.  *Id.* at 187.

Dr. Manos reviewed Plaintiff's records on September 25, 2013, and affirmed Dr. Haque's assessment.  *Id.* at 190-99.

## III.  <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1).  The term "disability"—as defined by the Social Security Act—has specialized meaning of limited

scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …."  *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to Plaintiff's application for benefits.  He did so by considering each of the five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 404.1520.  He reached the following main conclusions:

Step 1:    Plaintiff has not engaged in substantial gainful employment since March 1, 2010.

Step 2:    She has the severe impairments of "(symptoms attributed to) fibromyalgia, obstructive sleep apnea, psoriatic arthritis, temporomandibular joint dysfunction, occipital/trigeminal neuralgia with resulting headaches, affective (mild depressive) disorder, generalized anxiety disorder."

Step 3:    She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:    Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … subject to the following additional limitations: (1) no more than occasional crouching, crawling, kneeling, stooping, or climbing of ramps or stairs; (2) no climbing of ladders, ropes, or scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) no operation of automotive equipment; (5) no concentrated exposure to loud noise; (6) limited to working indoors; (7) no concentrated exposure to wet or

cold conditions; (8) no more than occasional overhead reaching; (9) limited to performing unskilled, simple, repetitive tasks."

Step 4:       She is unable to perform any of her past relevant work.

Step 5:       She could perform a significant number of jobs that exist in the national economy.

(Doc. #5, *PageID* #s 54-74). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 74.

## V.   <u>Discussion</u>

Plaintiff contends that the ALJ did not conduct the hearing ordered by the Appeals Council; did not properly apply the treating physician rule; error in his evaluation of her fibromyalgia; and made improper and unjustified findings concerning her symptom severity.

The Commissioner maintains that substantial evidence supports the ALJ's decision.

### A.   **Medical Opinions**

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

In the present case, ALJ Kenyon found that Dr. Gebhart's opinions that Plaintiff could not work and regarding her specific functional limitations[3] could not be given controlling or even deferential weight. (Doc. #5, *PageID* #67). Instead, he rejected the opinions, assigning "no weight whatsoever."[4] *Id.* ALJ Kenyon did, as the Regulations

---

[3] For example, "an ability to sit less than two hours in a work environment during a typical eight-hour workday, a capacity to stand/walk less than two hours during a typical eight-hour workday, an inability to complete an eight-hour workday without lying down." (Doc. #5, *PageID* #67).
[4] Shortly thereafter, the ALJ assigned the same opinions "little-to-no weight." (Doc. #5, *PageID* #67).

require, provide some reasons for discarding Dr. Gebhart's opinions.  Most of his criticism focuses on one theme:  a lack of objective medical evidence.

The ALJ found, "the degree of functional limitation imposed by Dr. Gebhart with respect to the claimant's capacity to sit, stand, and walk is completely unwarranted and strains credulity."  *Id*.  Indeed, according to the ALJ, "Such a drastic degree of limitation is in no way supported by convincing objective medical evidence or clinical findings."  *Id*.  He cites Dr. Jeffrey S. Hoskins's treatment notes from March 2012 in support of his conclusion.  Specifically, Dr. Hoskins noted that Plaintiff was well developed, well nourished, and in no acute distress.  There are two problems with this reason for rejecting Dr. Gebhart's opinions.

First, the ALJ's statement—and several other findings throughout his decision—reveals he may misunderstand fibromyalgia.  *See Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011) ("the ALJ's rejection of the treating physicians' opinions as unsupported by objective evidence in the record obviously stems from his fundamental misunderstanding of the nature of fibromyalgia.") (citation omitted).  Case law establishes, and Soc. Sec. R. 12-2p indicates, that a patient suffering from fibromyalgia presents to physicians with no objective signs or symptoms.  Indeed, "fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs."  *Rogers*, 486 F.3d at 243 (footnote omitted) (citing, in part, *Preston v. Sec'y of HHS*, 854 F.2d 815, 820 (6th Cir. 1988)); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (the ALJ mistakenly "depreciated the gravity of Sarchet's fibromyalgia

because of the lack of any evidence of objectively discernible symptoms, such as a swelling of the joints."); *Starcher v. Comm'r of Soc. Sec.*, No. 2:15cv3113, 2016 WL 5929048, at *5 (S.D. Ohio 2016) (Kemp, M.J.) report and recommendation adopted, 2016 WL 6493427 (Nov. 2, 2016) (Graham, D.J.).  Dr. Gebhart likewise explained that there is no method to objectively determine if a person has fibromyalgia.  (Doc. #5, *PageID* #1116).  Thus, the ALJ committed error to the extent he required objective evidence of fibromyalgia.[5]

Along these same lines, earlier in his decision, ALJ Kenyon concluded, "the diagnosis of fibromyalgia, *et al.*, appears to have been one of exclusion; that is, absent a more definitive medically determinable basis for the claimant's alleged pain complaints, such symptoms were attributed to the rather nebulous diagnosis of fibromyalgia (or fibromyositis or, simply, chronic pain syndrome)."[6]  (Doc. #5, *PageID* #59).

A little background information is necessary to understand the ALJ's error.  The Social Security Administration—recognizing that fibromyalgia is a complex, but common, medical condition—provides two sets of criteria an ALJ may use to determine if an individual has a medically determinable impairment of fibromyalgia—the 1990 American College of Rheumatology Criteria and the 2010 American College of

---

[5] ALJ Kenyon also rejected Dr. Gebhart's opinion that Plaintiff would likely miss ten to twelve days of work per month and his opinion that her disability began in March 2010.  He found that Dr. Gebhart's conclusions were "unsubstantiated by plausible objective medical evidence or clinical findings."  (Doc. #5, *PageID* #68).  Further, "[t]he estimate of potential workdays missed suggested by Dr. Gebhart is speculative at best and has no logical foundation in the objective medical evidence or clinical findings of record …."  *Id*.  This also constitutes error for the same reason—fibromyalgia cannot be confirmed by objective testing.

[6] The ALJ similarly criticizes Dr. Gebhart's opinion because his "conclusions are inconsistent with … the (essentially negative) results of repeated clinical testing and examinations."  (Doc. #5, *PageID* #68).

Rheumatology Preliminary Diagnostic Criteria. Soc. Sec. R. 12-2P, 2012 WL 3104869, *2-3.

In this case, ALJ Kenyon acknowledges the 1990 criteria, discusses the shortfall of evidence concerning tender points (one of the requirements under the 1990 criteria), and skeptically finds that Plaintiff has "(symptoms attributed to) fibromyalgia." (Doc. #5, *PageID* #s 58-59). He does not, however, discuss the 2010 criteria. Although that in and of itself is not an error, the 2010 Criteria illuminate an important aspect of fibromyalgia relevant to this case. Specifically, under the 2010 Criteria, the Administration will find a person has a medically determinable impairment of fibromyalgia if, among other criteria, "[e]vidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded." Soc. Sec. R. 12-2P, 2012 WL 3104869, *3. In other words, under the new standards, the diagnosis of fibromyalgia *requires* that other disorders be excluded. Thus, the ALJ erred to the extent that he discounted Dr. Gebhart's opinions because he ruled out other disorders.

The second problem is that the ALJ's summary is not a reasonable summary of Dr. Hoskins's notes. In addition to the notes recognized by the ALJ, Dr. Hoskins indicated that Plaintiff reported that, in the previous few years, she has had neck pain, severe headaches, pain in between her shoulder blades, and some stiffness. More recently, her shoulder pain began radiating into her upper left arm and she experiences occasional numbness and tingling in her hand. Further, her range of motion is limited and when she has a flare-up, she cannot move her head. Dr. Hoskins described Plaintiff as a "somewhat anxious appearing female." (Doc.#5, *PageID* #570). Further, a physical

exam revealed (consistent with her report) that she had a limited range of motion in her neck with rotation to the right greater than to the left. *Id.* Turning to her upper extremities, she has "some pain with resistance to abduction" and her brachioradialis reflex on her left was absent. *Id.* AP and lateral cervical spine films showed some degenerative changes, a posterior osteophyte complex at C5, and some disc height loss at C3-4, C4-5. *Id.* Based on Plaintiff reported pain radiating to her upper left arm and occasional numbness and tingling in her left hand, Dr. Hoskins ordered an MRI. *Id.* at 570-71. The MRI did not reveal anything that "would explain the active radiculopathy that she is having." *Id* at 569. As a result, he recommended she consult with a neurologist. *Id.* In sum, many of Dr. Hoskins's notes are consistent with Dr. Gebhart's opinion. Yet, the ALJ ignored or overlooked those notes.

Turning to the ALJ's next reason, he found that Dr. Gebhart's "pessimistic assessment" was "quite at odds" with the record-reviewing physicians' opinion that Plaintiff could perform medium exertion. (Doc. #5, *PageID* #67). Their assessments, ALJ Kenyon concluded, "appear closer to the truth." *Id.* at 67-68. He explained, "upon repeated examination, the claimant exhibited intact musculoskeletal status (i.e., negative for joint or muscle pain) and good range of motion in all major joints with normal gait (Exhibits 4F at 6, 5F at 13, 7F at 17, 11F at 6, 13F at 27, and 31F at 116). On other occasions, the claimant exhibited unremarkable gait and intact (full) muscle strength or normal gait and station with intact motor strength and muscle tone (Exhibits 6F at 9 and 13F at 27)." *Id.* at 68.

ALJ Kenyon is correct that those records include those notes. But again, he does not tell the whole story. The ALJ first cites Grandview Hospital records from December 18, 2012 and December 19, 2012 (4F at 6). *See* Doc. #5, *PageID* #s 582-88. The records reveal that Plaintiff presented to the emergency room in "mild distress" after having a headache, photo phonophobia, and nausea for an entire day. *Id.* at 582, 584. She reported that, the day before, her doctor gave her a steroid injection as part of the treatment for occipital neuralgia. *Id.* Since the injection, Plaintiff had blurred vision and a headache "across her head" that worsened with exposure to bright lights and loud sounds. It felt similar to a migraine and nothing—not even her new medication, Talwin—was helping the pain. *Id.* Her inferior occiput was tender to palpation where she was injected. Additionally, as noted by the ALJ, she had normal range of motion, a normal gait, and no tenderness to palpation. A CT scan of her head revealed no evidence of acute intracranial process and a basic metabolic panel was within normal limits (other than creatinine of .56). After Plaintiff was treated with Compazine, Toradol, and Benadryl, Dr. McMullin discharged her with instructions to see her neurologist. *Id.* at 585-86.

The ALJ also cites treatment records from a neurological consultation with Michael J. Valle, D.O. (5F at 13). *See* Doc. #5, *PageID* #s 601-03. Dr. Valle noted that Plaintiff reported that she had daily headaches accompanied by "rather severe" nausea. *Id.* at 601. She tried physical therapy with some success. She likewise tried chiropractic therapy but stopped because it resulted in significant dysautonomia. She tried one round of occipital nerve blocks and briefly had relief from pain. Unfortunately, the pain

returned and a second round did not help. She has tried several medications, none of which helped and some of which caused negative side effects. *Id.* Although the ALJ accurately observed that Dr. Valle noted that Plaintiff had a normal gait and full range of motion, Dr. Valle also indicated that Plaintiff's cervical spine was tender. *Id.* at 602. Dr. Valle diagnosed headache disorder, likely migrainous in origin, and prescribed several medications. *Id.* at 603.

The next record cited by ALJ Kenyon includes treatment notes from Robert A. Goldenberg, M.D., who Plaintiff saw for tinnitus (7F at 17). *See* Doc. #5, *PageID* #s 629-31. On May 14, 2012, Plaintiff reported an increase in tinnitus and headaches. *Id.* at 629. Further, she indicated that she has sleeping problems, unintentional weight gain, blurred vision, itchy eyes, dizziness, ringing in her ears, joint pain and stiffness in joints, headache, severe facial pain, and excessive fatigue. *Id.* As the ALJ correctly observed, Plaintiff's muscle tone was normal and muscle strength was intact in all four extremities. *Id.* at 631. However, contrary to the ALJ's representation, Dr. Goldenberg, indicated that her gait was ataxic. *Id.*

ALJ Kenyon next directs attention to notes from Eugene G. Chio, M.D., at OSU Wexner Medical Center (11F at 6). *See* Doc. #5, *PageID* #s 759-61. Plaintiff presented to Dr. Chio with tinnitus as well as ear and postauricular pain. *Id.* at 759-60. He indicated in "review of systems" that Plaintiff was negative for joint or muscle pain and negative for headaches. However, in notes from the same appointment, Aleigha Purcell, M.A., indicated Plaintiff was positive for ear pain, tinnitus, joint pain, dizziness, headaches, and depression. *Id.* Additionally, Dr. Chio's physical exam revealed that

Plaintiff's neck had multiple "tender/trigger points" especially around her right mastoid tip. *Id.* at 761. He also noted that in the past, she had high ANA levels. *Id.* at 760-61. Dr. Chio concluded, "it appears that this is non otologic in nature. Fibromyalgia is in the differential, esp[ecially] with the trigger points and elevated ANA." *Id.* at 761. Dr. Chio referred Plaintiff to rheumatology for further work up. *Id.*

The ALJ also cites two treatment record from Dr. Gebhart's office (9F at 21, 13F at 27; 19F at 35-36; 31F at 116). *See* Doc. #5, *PageID* #s 663-68, 1225-30. At the first of those appointments, on January 11, 2013, Plaintiff saw Sandy Anderson, NP, reporting a weeklong headache, nausea, vision changes, dizzy spells, and a recent ER visit. *Id.* at 663. Plaintiff indicated that her headache felt different from the occipital-neuralgia headaches that she normally has. *Id.* at 667. She had vision disturbances, nausea, and right-sided facial numbness and tingling for three days. *Id.* The pain medication she usually takes was not helpful. *Id.* Ms. Anderson diagnosed a migraine and prescribed medication. She also instructed Plaintiff to go to the emergency room if the headache worsened. *Id.* at 668.

On December 23, 2013, Plaintiff saw Dr. Gebhart. *Id.* at 1225-30. Plaintiff reported some improvement with "H Doxycycline" but unfortunately, she started having headaches, pain in the right side of her neck, and increased body pains. *Id.* at 1230. Dr. Gebhart noted that her right occiput was tender and indicated that she was experiencing situational depression. *Id.* He instructed her to continue her medication and follow up with a neurologist.

ALJ Kenyon also cites records from Plaintiff's physical therapy (6F at 9).  *See* Doc. #5, *PageID* #s 609-14.  Although Plaintiff's physical therapist, Gail Counts, PT, does indicate that her gait is unremarkable, she also identified several problems.  For instance, Plaintiff's active range of motion for cervical rotation (right and left) was 45 degrees.[7]  Her passive range of motion for cervical rotation on the left was limited.  Her range of motion for shoulder flexion was 150 degrees.[8]  Ms. Counts noted that upon palpation, Plaintiff's upper-to-mid thoracic spine was maximally tight.  Her mid-to-lower cervical joints were moderately restricted with lateral glides.  Her posture revealed "decreased thoracic kyphosis with moderately forward head, rounded shoulders."  *Id.* at 612.  Ms. Counts also noted that Plaintiff had difficulty with activities of daily living because of her headaches, dizziness, and ringing in her ears.  *Id*.  Further, after Plaintiff completed 13 sessions, Ms. Counts advised Dr. Gebhart that her pain decreased but not consistently, her right cervical rotation improved but remained limited, and she had less difficulty with activities of daily living but not consistently.  *Id.* at 1036.

Together, these records provide a fuller picture of Plaintiff's impairments than the ALJ's limited summary.  With a fuller picture, it is much easier to see that ALJ Kenyon picked and chose little bits of evidence that support his position, ignoring evidence that detracts from his non-disability conclusion.  "[A] substantiality of evidence evaluation

---

[7] Normal range of motion for cervical rotation is up to 90 degrees on both sides.  Erik E Swartz, R. T Floyd, & Mike Cendoma, *Cervical Spine Functional Anatomy and the Biomechanics of Injury Due to Compressive Loading*, J. ATHL. TRAIN. 2005 Jul-Sep; 40(3): 155-161, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1250253/.

[8] Normal range of motion for shoulder flexion is 180 degrees.  Dr. Robert Manning, *What Is the Normal Range of Motion in the Shoulder?*, LIVESTRONG.COM, https://www.livestrong.com/article/46391-normal-range-motion-shoulder/.

does not permit a selective reading of the record.  'Substantiality of the evidence must be based upon the record taken as a whole.  Substantial evidence is not simply some evidence, or even a great deal of evidence.  Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec*., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting, in part, *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984) (internal citations and quotation marks omitted)).

The ALJ also discounted Dr. Gebhart's opinions because, "The extent of impairment described by Dr. Gebhart could only be based on uncritical acceptance of the claimant's subjective pain complaints."  (Doc. #5, *PageID* #67).  This, however, is not a reasonable assumption because physicians are trained to both consider and investigate subjective reports as opposed to blindly accepting them on face value.  As a physician, Dr. Gebhart must rely, at least in part, on Plaintiff's—or any other patient's—statements.  But that does not mean that he based his opinions on "uncritical acceptance" of Plaintiff's reports.

Further, as her long-time treating physician, Dr. Gebhart is in the best position to evaluate her statements.  *See* 20 C.F.R. § 404.1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.).  And, he has "no doubt at all" in Plaintiff's credibility and when asked if she had done or said anything to make him doubt her honesty, he replied, "It's just the opposite.  I see the frustration in her face.  When she

comes in and inevitably she starts crying and we have a great relationship and you can just see it, I know my patients so well. I can see it in her eyes how much this is hurting her…." (Doc. #5, *PageID* #1125). ALJ Kenyon offers no evidence—let alone substantial evidence—to support his conclusion that Dr. Gebhart improperly relied solely on Plaintiff's statements and thus incorrectly assessed the extent of her impairments.

Next, the ALJ discounted his opinion because "Dr. Gebhart based much of his opinion on the claimant's purported inability to maintain concentration but such a finding is noticeably absent elsewhere in the case record." (Doc. #5, *PageID* #68). This reason is puzzling because both Dr. Gebhart's deposition testimony and medical statement indicate Plaintiff is unable to work because of her *physical* limitations. For instance, he indicates that Plaintiff "would not have been physically capable of performing the duties of any job from March of 2010 until the current day (August 25, 2014)." *Id.* at 1385. Although he does opine that Plaintiff struggles with both concentration and attention, both are the result of her moderate-to-severe pain. *Id.* at 1127; *see also id.* at 1385. The case record is replete with notes regarding Plaintiff's pain. *See e.g., id.* at 661 ("severe ringing and pain under ears, crying, anxious"); *id.* at 1230 ("pain in neck right and body pains worsened"); *id.* at 904 ("ringing in ears with neck pain"); *id.* at 899 ("has[] muscle pain all over; [a.m.] headache right side hurts behind eye").

Likewise, when asked if he would hire Plaintiff, Dr. Gebhart responded no, because she would not be at work often enough. *Id.* at 1131. It is only when asked specifically whether he would be concerned about Plaintiff's cognitive ability to do work that Dr. Gebhart indicated that he would be concerned because depression, anxiety, and

fibromyalgia all reduce her focus and concentration. *Id.* at 1132. When asked if Plaintiff could work as a nurse (assuming she was qualified), Dr. Gebhart's response focused on her physical limitations: "Absolutely not. More on her feet, she'd never be able to tolerate it. Probably go home early and frequently, and again, miss many days of work." *Id.* at 1133. Because Dr. Gebhart did not base his opinion on Plaintiff's inability to maintain concentration, substantial evidence does not support the ALJ's reason.

The ALJ assigned "minimal weight" to Dr. Gebhart's conclusion that Plaintiff is unable to work because, "[w]hether any documented reduction in capability renders an individual 'disabled' (i.e., ultimately, whether the individual is unable to perform work existing in significant numbers in the national economy) is an issue to be resolved under Social Security rules and regulations." *Id.* at 68. The fact that Dr. Gebhart expressed an opinion on the ultimate issue of Plaintiff's disability status is not a valid reason to discount it. "The pertinent regulation says that 'a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.' That's not the same thing as saying that such a statement is improper and therefore to be ignored...." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (internal citation omitted); *see Kalmbach v. Comm'r of Soc. Sec.*, No. 09-2076, 409 F. App'x 852, 861 (6th Cir. 2011) ("the fact that the ultimate determination of disability, *per se,* is reserved to the Commissioner, 20 C.F.R. § 404.1527(e) [§ 416.927(d)(1)], did not supply the ALJ with a legitimate basis to disregard the physicians' [opinions].").

In sum, although the ALJ provided reasons for discounting Dr. Gebhart's opinions, substantial evidence does not support those reasons. Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[9]

**B.     Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or

---

[9] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether she was under a disability and whether her application for Disability Insurance Benefits should be granted.

**IT IS THEREFORE ORDERED THAT**:

1.   The Commissioner's non-disability finding is vacated;

2.   No finding is made as to whether Plaintiff Marcina Kilgore was under a "disability" within the meaning of the Social Security Act;

3.   This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4.   The case is terminated on the Court's docket.

Date:  July 17, 2019                        *s/Sharon L. Ovington*
                                            Sharon L. Ovington
                                            United States Magistrate Judge